**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | | |
|---|---|---|
| CLEAR SKY CAR WASH LLC, ET AL., | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | **PLAINTIFFS'** |
| versus | ) | **MEMORANDUM IN OPPOSITION** |
| | ) | **TO MOTION TO DISMISS** |
| | ) | **BY GREENHORNE & O'MARA,** |
| | ) | **THOMAS COPELAND,** |
| CITY OF CHESAPEAKE VIRGINIA, ET AL. | ) | **EVENLYN JONES, AND DANIEL JONES** |
| | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| DEFENDANTS | ) | **CASE NO.: 2:12-CV-194-MSD** |
| | ) | |

Plaintiffs Clear Sky Car Wash LLC, Clear Sky Car Wash Operating LLC, Samuel Jacknin, and Charles Einsman (collectively "Clear Sky") hereby request oral argument and file their Memorandum in Opposition to the Motion to Dismiss by Defendants Greenhorne & O'Mara, Thomas Copeland, Evelyn Jones, and Daniel Jones (collectively "Greenhorne") (Docket Entry 8). This brief also refers throughout to the largely duplicative Defendant City of Chesapeake Virginia's Motion to Dismiss (the "City") (Docket Entry 13). Clear Sky will file a separate response to the unique aspects of that specific filing on or about June 1, 2012, particularly the arguments directed to Clear Sky's causes of action other than the Uniform Act.

The City hired Greenhorne to act as its agent and partner with respect to the attempted taking of Clear Sky's property. Given that, and their overlapping arguments, references throughout this brief to "the City" also extend to Greenhorne individually and collectively except where noted.

**INTRODUCTION**

Federal and state governments once exercised plenary power to seize private property like Clear Sky's car wash business, subject only to a *post*-deprivation remedy of just but incomplete compensation. After many abuses, unnecessary destruction of businesses and jobs, and inconsistent

results, Congress passed a "Uniform Act" to protect communities and owners like Clear Sky by setting conditions precedent that must be satisfied *before* a seizure can begin.

The City, collectively including its agent Greenhorne, intentionally violated every aspect of the Uniform Act in an attempt to bulldoze a federal highway through Clear Sky's business without first providing the due process and equal protection specifically mandated by Congress to protect Clear Sky.   The City wants to coerce Clear Sky and others to give up their pre-taking rights, and accept millions of dollars less than they are entitled, in order to prevent the failure of the troubled project for lack of funding.

Clear Sky filed its Complaint to compel the City to comply with the Uniform Act before proceeding with any taking, to provide the full relocation and protection owed, and to honor a contractual agreement to provide information and proceed properly.   The City's acts under color of law to infringe Clear Sky's rights, and the City's conspiracy with others to do so, violate not only the Uniform Act but also 42 U.S.C. §§ 1983, 1985, and 1988.   This warrants an award of attorneys' fees and compensation to Clear Sky, distinct from just compensation for any later taking.

In response, the City and Greenhorne both individually filed their own Motion to Dismiss in which the City and Greenhorne both simplistically arguing that an outdated Missouri district case from 1973 somehow bars any application of the Uniform Act to the City.   However, the City and Greenhorn completely ignores and fails to cite binding Fourth Circuit and Eastern District of Virginia authority directly on point that the Uniform Act applies in the present circumstances and warrants an injunction to ensure compliance before any taking proceeds. Moreover, none of the City's or Greenhorne's arguments and cases, all of which rely in the same erroneous 1973 Missouri decision, address the many portions of the Uniform Act violated here, particularly the modern Uniform Act regulations for transportation projects promulgated in 1989 and repeatedly updated and expanded through 2011.

Accordingly, the Motion to Dismiss and to Strike should be rejected.

## STANDARD OF REVIEW

In assessing the viability of Clear Sky's claims for relief, every factual allegation made by Clear Sky must be accepted as true, as well as any fact that is capable of being proven consistently with those allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In addition, though such a low threshold is hardly needed here, no motion to dismiss can be granted if the allegations reasonably suggest that discovery could reveal evidence to support the claims. Bell v. Twombly, 550 U.S. 544 (2007) abrogating Conley v. Gibson, 335 U.S. 41, 45-46 (1957).

## SUMMARY OF UNDISPUTED FACTS
## REGARDING CITY VIOLATIONS

The following is a condensed summary of undisputed facts from the Complaint, as well key Uniform Act provisions violated by the City.

### The Federal Highway Project To Seize Clear Sky's Car Wash

Clear Sky has operated a car wash at the corner of Dominion Boulevard and Great Bridge Boulevard in Chesapeake Virginia since 2008. See Clear Sky's Complaint (Docket Entry 1) ("Claim") at ¶¶ 29-33.

The City, "in partnership with the [USDOT's] Federal Highway Administration" ("FHWA"), has a "project for the widening of U.S. Route 17/Dominion Boulevard" (the "Project"), based on a design that runs directly through the Clear Sky property. The federally funded Project is a federally significant part of the National Highway System High Priority Corridors within the Norfolk to Raleigh Connector ("Federal Project No.: HPP-017-(010)") Claim at ¶¶ 34-45.

The City has authorized by council resolution "the acquisition by purchase or condemnation" of the Clear Sky business, but this is conditioned on "satisfying all local, state and federal requirements . . . ." Claim at ¶¶ 44-50; see also Clear Sky Opposition to Motion to Dismiss, City of Chesapeake Virginia v. Clear Sky Car Wash LLC, No. 2:12CV194 (E.D.Va). The City has

explained that the "federal requirements" it must "satisfy" arise from the "the federal acquisition process" as a result of the "partial federal funding." Id. This is the Uniform Relocation Assistance and Real Property Acquisition Policies for Federal and Federally Assisted Programs (the "Uniform Act"). 42 U.S.C. § 4601 *et seq.*; 49 C.F.R. Part 24.

**The Relevant Uniform Act Provisions In 42 U.S.C. § 4601 Et Seq.
Are Expressly Designed To Protect Clear Sky Before Any Taking Proceeds**

In enacting the Uniform Act, Congress, expressly recognized and codified the need for substantive and procedural due process and equal protection safeguards to those facing the incredible power of federally-funded state agencies to seize property and displace companies and property owners. Without these protections, unnecessary costs and unrecoverable litigation expenses would cripple small businesses long before they could act to protect their interests and attempt to relocate and continue operations. See Claim at ¶¶ 156-166.

Specifically, Congress found that "the displacement of businesses often results in their closure" and that "minimizing the impact . . . is essential to maintaining the economic and social well-being of communities." 42 U.S.C. §§ 4621(a)(3-4). Earlier laws since the 1940s had "resulted in burdensome, inefficient, and inconsistent compliance requirements and procedures", warranting enactment of the Uniform Act in 1971 to create a single "policy for the fair and equitable treatment of persons displaced [due to] projects undertaken . . . with Federal assistance." 42 U.S.C. §§ 4621(a)(5) and (b). See Claim at ¶¶ 156-160.

A key Congressional "purpose" memorialized in the Uniform Act statute is that affected "persons shall not suffer disproportionate injuries [due to] projects designed for the benefit of the public[,] and to minimize the hardship of displacement on such persons" they shall be "accorded equal treatment." 42 U.S.C. §§ 4621(c). As a result, Congress specifically commanded that federal-aid projects must recognize "problems associated with the displacement of . . . businesses [and] resol[ve] such problems to minimize adverse impacts on displaced persons . . . ." and make

4

"timely recommendations on the needs and preferences . . . for relocation assistance."  42 U.S.C. §§ 4625(a)(1)-(2) and (c)(1).  Furthermore, Congress commanded that there be "assist[ance] for a person displaced from a business . . . in obtaining and becoming established in a suitable replacement location."  42 U.S.C. §§ 4625(c)(4).  See Claim at ¶¶ 161-165

Congress enacted the Uniform Act and its "appraisal" requirement to "minimize waste, fraud and mismanagement", and therefore mandated there be no double "payment or assistance" for relocation or acquisition costs under the Uniform Act and again in a subsequent just compensation award for a taking.  42 U.S.C. §§ 4621(c)(1), 4631(b) and 4652.  See Claim at ¶¶ 164-166.

### The Relevant Uniform Act Provisions In 49 C.F.R. Part 24 Are Designed To Define And Enforce The Pre-Taking Protections Mandated By Congress

Congress recognized the need for regulations to effectuate and then stay current with all of these requirements over time, and therefore directed that the USDOT and its FHWA "develop, publish and issue . . . such regulations as may be necessary . . . ."  42 U.S.C. § 4633(a)(1).  Based on this command, the FHWA promulgated "49 C.F.R. Part 24 [which] implements the [Uniform Act] 42 U.S.C. 4601 *et seq.* [as it] applies to all acquisitions of real property or displacements of persons resulting from . . . federally-assisted programs or projects . . . ."  Federal Register Vol. 70, No. 2 at 590 (January 4, 2005).  "The purpose is to implement [all of Uniform Act] 42 U.S.C. 4601 *et seq.*" with the "objectives [to] ensure that owners of real property . . . are treated fairly and consistently, [and] to encourage and expedite acquisitions by agreements with such owners, to minimize litigation . . . .", so owners do "not to suffer disproportionate injuries" and to ensure that these regulations are implemented "in a manner that is efficient and cost effective."  Id.  See Claim at ¶¶ 166-170.

A complete copy of the latest Uniform Act regulations and Appendix enacted in 2011 is attached as Exhibit 1.  All citations are to those current regulations unless otherwise noted.

The City is defined as an "acquiring agency" for the Project acting on behalf of the federal

5

government, and must therefore provide a formal "appraisal" of Clear Sky's property.  42 C.F.R.

24.2(a)(2) ("acquiring agency" defined); 42 U.S.C. § 4601 ("appraisal" definition); 42 U.S.C. §

4628 (when "real property is acquired by a State agency at the request of a Federal agency for a

Federal program or project, such acquisition shall . . . be deemed an acquisition by the Federal

agency having authority over such program or project").  See Claim at ¶¶ 161-170.

The "appraisal" is so central to every goal and requirement in the rest of the Uniform Act

that the regulations repeatedly mandate there be no "conflict of interest" related to its drafting.  42

U.S.C. § 4601 (Congress itself demanded that the "appraisal" come only from "a qualified

appraiser" and that it be "independently and impartially prepared"); 49 C.F.R. 24.102(n)(1)-(2),

24.104 ("conflict of interest" rules).  This means that both the "appraiser" and a mandatory "review

appraiser" must not "have any interest, direct or indirect, in the real property being valued . . . ." and

no "person shall attempt to unduly influence them."  49 C.F.R. 24.102(n)(1)-(2), 24.104.  Even

more critically, no "review appraiser" can be "authorized . . . to act as negotiator for real property

for which that person has made an . . . appraisal review."  49 C.F.R. 24.102(n)(3).  See Claim at ¶¶

170-175.

Minimum requirements for the contents of a usable appraisal are carefully detailed, and they

must describe the entire property "including items identified as personal property".   49 C.F.R.

24.103(a)(2)(i).  A proper appraisal also must include "an analysis and reconciliation of approaches

to value used that is sufficient to support the appraiser's opinion of value" as well as "comparable

sales, including a description of all relevant physical, legal, and economic factors . . . ."  49 C.F.R.

24.103(a)(2)(i)-(ii).  There are no exceptions:  "Appraisals performed for Federal and federally-

assisted real property acquisition must follow the requirements of this regulation."  See Exhibit 1,

Appendix Section 24.103 at 269.  "Before the initiation of negotiations the real property to be

acquired shall be appraised" and "just compensation" established and proffered for not "less than

the approved appraisal of the market value of the property."  49 C.F.R. 24.102(c)-(d).  See Claim at ¶¶ 176-180.

The City is "required to provide to a property owner" like Clear Sky all of this required information in "plain, understandable [written] language", including the statement of just compensation and "approved appraisal" on which it must be based.  49 C.F.R. 24.5, 24.102(c). Thereafter, the City must "discuss . . . the basis for the offer of just compensation . . . .", allow Clear Sky a "reasonable opportunity to . . . present material which the owner believes is relevant to determining the value of the property and to suggest modification . . ." and the City must "consider the owner's presentation"  49 C.F.R. 24.102(f).  "Regardless of project time pressures, property owners must be afforded this opportunity."  See Exhibit 1, Appendix Section 24.102(f) at p. 268. "If the information presented by the owner  . . . indicates the need for new appraisal information" the City is obligated to "have the appraisal(s) updated or obtain a new appraisal(s)" and update the just compensation amount accordingly.  49 C.F.R. 24.102(g).  See id.

In order to enforce these protections under the Uniform Act, "[b]efore requiring the owner to surrender possession of the real property [the City must] deposit with the court, for the benefit of the owner, an amount not less than . . . the approved appraisal . . . ."  49 C.F.R. 24.106(j).  Even where "exceptional circumstances" such as an "emergency project when there is no time to make an appraisal" otherwise might warrant, entry is barred absent the "prior approval of the owner".  49 C.F.R. 24.106(j) and Exhibit 1, Appendix Section 24.102(j) at p. 268.  The City is prohibited from "defer[ing] negotiations or condemnation or the deposit of funds with the court, or . . . any other coercive action in order to induce agreement on the price to be paid for the property."  49 C.F.R. 24.106(h).  See Claim at ¶¶ 183-184.

In addition to the appraisal and deposit into court, which helps the business calculate and access the resources needed to consider relocation options, the City must provide relocation

assistance.  The City is required to "develop solutions to minimize the adverse impacts of displacement" and determine "the relocation needs and preferences of each business".  49 C.F.R. 24.205.  This includes an interview with Clear Sky regarding "replacement site requirements . . . and the financial capacity of the business to accomplish the move", a "resolution of personalty/realty issues" identified in the appraisal, an "estimate of the time required for the business to vacate the site" and an "estimate of the difficulty in locating a replacement property.  49 C.F.R. 24.205.  Furthermore, the City must provide "information on the availability, purchase prices, and rental costs of suitable commercial . . . properties and locations" and assist "to obtain and become established in a suitable replacements location."  Id.  See Claim at ¶¶ 185-186.

### The City Repeatedly And Clearly Violated The Uniform Act<br>To Coerce Clear Sky In Precisely The Way Congress Sought To Prevent

The Uniform Act, therefore, presents a straightforward path for an authority like the City to work with businesses like Clear Sky to cooperatively identify a proper valuation and resulting relocation options.  Indeed, the Uniform Act requires an opportunity for a company like Clear Sky to review and accept a fair government appraisal and then focus exclusively on relocation to save their business.  This allows owners a chance to avoid takings litigation entirely, which otherwise would force them to wait for months for an incomplete post-deprivation remedy too late to help.

Instead, the City repeatedly violated the Uniform Act in every way imaginable and forced Clear Sky into this litigation.  The City obtained an appraisal, the "Dundon Report", but egregiously violated the prohibition on interference by ordering Mr. Dundon to determine and calculate the valuation based on square footage of the land rather than a far higher pad side valuation.  The Dundon Report complies and nowhere even considers pad site value.  That is hardly the independent reconciliation of approaches to value that is legally required.  See Claim at ¶¶ 80-94.

Normally, these and other errors undervaluing Clear Sky would be addressed and corrected during the "independent review appraiser" process required by the Uniform Act.  However, the City

carefully circumvented that protection and attempted fraudulently to induce Clear Sky to accept the improperly low valuation.  In August 2011, City agent Greenhorne assured Clear Sky that an unnamed "independent review appraiser" had fairly determined the Dundon Report to be "appropriate" to "determine the market value" and "just compensation" due.  See Claim at ¶¶ 94-105.

Only later would Clear Sky find out that the review appraiser was not independent at all as required by the Uniform Act.  To the contrary, the City had hired Greenhorne to act not only as the lead negotiator to keep the City's acquisition costs down, but also as the supposedly "independent" review appraiser.  Greenhorne ultimately admitted in writing that it "performed the appraisal review" related to Clear Sky while at the same time having "oversight responsibility [for] the negotiations and acquisitions".  See id.  There hardly could be a more direct conspiracy to violate Clear Sky's rights than this one already proven, and discovery has yet to commence.

In response to the City's letter from Greenhorne, before uncovering this subterfuge, Clear Sky sought in good faith to understand and discuss the City's position.  Clear Sky asked ten basic questions about the City letter and the included Dundon Report in order to "decide how [to] proceed[,] understand the Dundon Report properly and the City's conclusion that it equals just compensation", and Clear Sky proposed to work with the City "cooperatively and without costly disputes".  Clear Sky was trying to determine whether it should accept the Dundon Report as "appropriate" as claimed, whether it could get relocation assistance from the City, and whether it could avoid wasting hundreds of thousands of dollars to hire its own appraisers, experts, and a lawyer.  This is precisely the cooperative process mandated by the Uniform Act to avoid unnecessary litigation and unrecoverable costs to Clear Sky.  See Claim at ¶¶ 106-107.

Among its 10 basic questions, Clear Sky asked whether the City would "assess and value an actual replacement site" and car wash.  The City declined any such assistance in direct violation of

the Uniform Act requirements to investigate and help consider relocation options.  Clear Sky also asked why Dundon and the City used "square footage of land to calculate . . . compensation, instead of . . .  pad site" value and why they depreciated this 3 year old business by 43% based on an IRS "schedule . . . 'accelerated' over 7 years for business tax deduction purposes . . . . instead of using the economic life identified by [Dundon] of 'at least several decades'."  Again, the City refused to respond at all in direct violation of the Uniform Act command to consider Clear Sky's questions, much less revise the appraisal for these clear errors.  <u>See</u> Claim at ¶¶ 108-143.

In December 2011, Clear Sky sent an exhaustive 14-page review of the most egregious errors found in the Dundon Report, which had resulted in an undervaluation of more than $6.5 million.  The City repeatedly refused to respond to a single word of the analysis, much less revise the appraisal to address the many irrefutable errors, as the Uniform Act requires.  <u>See</u> Claim at ¶¶ 132-143.

Ultimately, the City and Greenhorne both admitted that the depreciation in the Dundon Report was wrong and that pad site valuation was appropriate as had been applied for other takings. However, to this day, they have refused to obtain a new appraisal or adjust the existing appraisal, valuation or deposit in any way to address this, despite the specific Uniform Act mandate to do so. The City also still refuses to provide any assistance whatsoever in locating or considering alternative sites.  Instead, the City cut off all such communications, refused settlement discussions, and purported to take Clear Sky's property -- forcing Clear Sky to file suit.  Claim at ¶¶ 136-154.

**The City Is Violating The Law In Order To Build The
<u>Financially Troubled Public Project At Clear Sky's Private Expense</u>**

The City has a clear, though illegal, reason for intentionally ignoring the Uniform Act.  The City has been under pressure to prevent the Project from failing due to insufficient funding and to avoid the proper but politically disastrous fix of raising public taxes to pay for it.  Refusing any relocation assistance to displaced businesses, and coercing property owners like Clear Sky to accept

10

millions of dollars less than they are entitled, is designed to speed the faltering Project and save enough money to make it work.  <u>See</u> Claim at ¶¶ 55-79..

The Project has been financially troubled from its start and almost failed at least twice when private financing could not be secured and a later government loan request was rejected.  Most recently, the City had to take extraordinary action to seek a loan unprecedented in this history of Virginia to avoid complete collapse.  The City had to promise speculative toll revenues as a way to provide collateral for the unique debt structuring.  The City based all of these efforts on repeated misrepresentations that the total land acquisition cost would be held under $65 million.  Just correcting the Dundon Report would add $6.5+ million more -- 10% over the total land acquisition estimate for the entire Project -- before a single correction for the dozens of properties other than Clear Sky.  As a result, the City has intentionally ignored the Uniform Act in order to avoid compliance expenses and undercut and coerce Clear Sky and others to vacate quickly for millions less than owed.  <u>See</u> <u>id</u>.

## ARGUMENT

### I.     JURISDICTION EXISTS IN THIS COURT FOR MANY REASONS, INCLUDING CONTROLLING FOURTH CIRCUIT AUTHORITY

There can be no legitimate dispute that original jurisdiction exists in this Court to hear and resolve Clear Sky's causes of action based on the Uniform Act, 42 U.S.C. §§ 1983/1985/1988, Due Process, Equal Protection, and Equitable Estoppel.  There are at many alternative statutory bases for reaching this conclusion, and extensive case law on point that requires this result.  Supplementary jurisdiction provides the basis for the final cause of action for Breach of Contract, which arises out of the same acts and omissions as the primary causes that rest on original jurisdiction.

### A.     Jurisdiction Arises Under 28 U.S.C. § 1331 For Uniform Act, Due Process, Equal Protection, §§ 1983/1985/1988, and Equitable Estoppel Claims

This Court has "original jurisdiction of all civil actions arising under the Constitution, laws,

or treaties of the United States."  28 U.S.C § 1331.  Lawsuits involving violations of the Uniform

Act long have been recognized to invoke precisely such original federal jurisdiction, including to

compel compliance, grant injunctions, obtain damages, and recover attorneys' fees.

      For example, the distinguished Circuit Judge Leon Higginbotham held, based on Supreme

Court and Fourth Circuit precedent, that a property owner has an absolute right to sue a city in

federal court for violations of the Uniform Act:  "[T]here exists a private cause of action against

state officials for [Uniform Act] violations . . . .   There is no suggestion in the laws or regulations

that . . . judicial review [is] precluded . . . . [and] bringing the matter to federal court" is a right.

Pietroniro v. Borough of Oceanport New Jersey, 764 F.2d 976, 980 (3rd Cir. 1985), cert. denied 474

U.S. 1020 (1985) (reviewing the Uniform Act, the Housing Act and HUD regulations similar to the

modern 49 C.F.R. Part 42) (citing Maine v. Thiboutot, 448 U.S. 1 (1980) and M.M. Crockin Co. v.

Portsmouth Redevelopment Housing Auth., 437 F.2d 784 (4th Cir. 1971) (other citations omitted)).

See also Pou Pacheco v. Soler Aquino, 833 F.2d 382, 400 (1st Cir. 1987) (recognizing jurisdiction

for private civil suit by owner under Uniform Act because "a private civil remedy may be implied

where the legislative purpose and history . . . make plain that those protected are intended to have an

individual interest of this type"); American Dry Cleaners and Laundry, Inc. v. U.S. Dept. of

Transp., 722 F.2d 70 (4th Cir. 1983) (citing and reaching same conclusion as M.M. Crockin that

jurisdiction exists under Uniform Act and regulations, but applying law differently given different

facts and regulations at issue); Home Furn. Co. of Charlotte, Inc. v. United States Dept. of Housing

and Urban Devpt., 324 F.Supp. 1401, 1403-04 (D.N.C. 1971) (relying on M.M. Crockin to grant

preliminary injunction until proper relocation assistance provided).

      The question of federal jurisdiction for claims against a state for violation of the 1971

Uniform Act already was well settled by 1975.  "Unquestionably, the plaintiffs' first claim presents

a federal question" for "a federally protected right under the Uniform" Act.  Young v. Harder, 361

F.Supp. 64, 71 (D. Kansas 1973) (considering 42 U.S.C. § 4636 and 45 C.F.R. 233.20, a predecessor to the modern 49 C.F.R. Part 24) (case relied upon by First Circuit in <u>Pou Pacheco</u>); <u>Lewis v. Brinegar</u>, 372 F.Supp. 424, 428 (E.D. Mo. 1974) (claim against state under Uniform Act "presents a federal question" under 28 U.S.C. § 1331 where amount in controversy provision – since removed -- is met); <u>Whitman v. State Highway Commission of Missouri</u>, 400 F.Supp. 1050, 1059 (W.D. Mo. 1975) (same) (string cite of 6 similar cases omitted).

Indeed, federal jurisdiction for Uniform Act claims has become so clear that this Division of the Eastern District of Virginia had no concern in certifying a class action against the City of Portsmouth for violating the Uniform Act to seize land at below market rates for a horse track.  <u>Pitt v. City of Portsmouth Virginia</u>, 221 F.R.D. 438, 441, 444, 447 (E.D.Va. 2004).  The Fourth Circuit similarly used its original jurisdiction for Uniform Act claims against state actors.  <u>American Dry Cleaners</u>, 722 F.2d at 70 (vacating injunction against North Caroline Department of Transportation and State Highway Administrator *not* for lack of original jurisdiction but *only* based on substantive ruling that there was "no showing that the government did not comply with the" Uniform Act in that case); <u>Chesapeake and Potomac Telephone Co. of Va. v. Landrieu</u>, 674 F.2d 298, 300 (4th Cir. 1982) ("The Act was intended to create rights that were not recognized at common law" and no question that state redevelopment agency could be sued in federal court) <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>Norfolk Redevelopment and Housing Auth. v. Chesapeake and Potomac Telephone & Telegraph Co.</u>, 464 U.S. 30, 32 (1983) (holding only that utility company did not have certain substantive Uniform Act reimbursement rights).  <u>See also</u> <u>Beaird-Poulan Division v. Department of Highways, State of Louisiana</u>, 441 F.Supp. 866 (W.D. La. 1977) (Uniform Act claims for state "agency actions" regarding relocation are "judicially enforceable") (string of 8 citations omitted) <u>aff'd</u> <u>and</u> <u>opinion</u> <u>adopted by</u> 616 F.2d 255 (5th Cir. 1980), <u>cert.</u> <u>denied</u> 449 U.S. 971, <u>reh'g</u> <u>denied</u> 449 U.S. 1104 (1981).

Courts as high as the Ninth Circuit have cited the Uniform Act repeatedly to support *injunctions* against state defendants to stop their land acquisitions until they fully comply with the Uniform Act's terms.  Lathan v. Volpe, 455 F2.d 1111, 1118-19, 1122 (9th Cir. 1972) (Uniform Act not only allows suit against state defendant in federal court, but also required preliminary injunction until relocation assistance actually provided), overruled on other grounds Lathan v. Brinegar, 506 F.2d 677, 691 (9th Cir. 1974); La Raza Unida v. Volpe, 337 F.Supp. 221, 224, 229, 233 (N.D. Ca. 1971) ("enjoining the State defendants from acquiring any more property for right-of-way under the project . . . until a satisfactory relocation assistance program is devised" -- even where that State erred "in good faith" -- because "the main thrust and purpose" of the Uniform Act is "to protect displaced persons even before construction"); aff'd 488 F.2d 559 (9th Cir. 1973) ("we see no reason to disturb" the "injunction . . . to secure compliance by the [state] with 42 U.S.C. Secs. 4622-4655 . . . ." of the Uniform Act).

In short, there can be no legitimate challenge to the original jurisdiction of this Court.

**B.      Eminent Domain Jurisdiction Exists Under 28 U.S.C. § 1358 Because The Action Results From A Taking "For The Use" Of The Federal Government**

In addition, Congress mandated that this Court shall have "original jurisdiction of all proceedings to condemn real estate for the use of the United States or its departments or agencies." 28 U.S.C. § 1358.   The statute makes irrelevant who files the proceeding, and only requires that the real estate at issue be "for the use" of the United States or its agencies.  Here, the attempted seizure of Clear Sky's property is for the use of the United States as part of the National Highway System. Claim at ¶¶ 33-34.  Jurisdiction therefore exists under 28 U.S.C. § 1358.[1]

---

[1] Clear Sky also asserted causes based on Due Process and Equal Protection under the 5th and 14th Amendments to the Constitution, as well as the legal doctrine of Equitable Estoppel and under 42 U.S.C. § 1983/1985/1988.   These claims are based on violations of the legal elements of the Uniform Act, but also stand independently on the underlying acts and omissions irrespective of the Uniform Act.  Therefore, these additional causes arise directly under the Constitution and invoke this Court's original jurisdiction by their own terms – something only the City Motion to Dismiss directly disputes.  Clear Sky will respond to these additional arguments on or before the June 1, 2012, deadline to do so.

Although this basis for jurisdiction was asserted in Clear's Sky Complaint, the City made no attempt to dispute it.[2]

### C.     The Administrative Procedure Act Provides A Confirmed Basis For Jurisdiction To Resolve The Uniform Act Claims

Congress also confirmed the right to judicial review through the Administrative Procedures Act, which also applies regarding the Uniform Act.  5 U.S.C. §§ 701(a)(1), 702, 706.  As detailed above, many courts have confirmed that violations of the Uniform Act allow for immediate appeal.[3]

The Fourth Circuit itself specifically explained that a business owner "may obtain review as a party 'aggrieved by agency action within the meaning of a relevant statute'" based on these provisions of the Administrative Procedures Act.  M.M. Crockin, 437 F.2d at 787 ("people displaced . . . have standing to challenge the adequacy of measures for their relocation"); accord M/V Cape Ann v. United States, 199 F.3d 61, 63-65 (1st Cir. 1999) (APA jurisdiction to review case that ultimately involved no substantive violation on its specific facts) (relying on Fourth Circuit American Dry Cleaners and First Circuit Pou Pacheco cases); Ackerly Communications v. Henderson, 881 F.2d 990, 993 (11th Cir. 1989) (APA allows Uniform Act review).[4]

### D.     Supplemental Jurisdiction Exists For The Breach Of Contract Claim

This Court has supplemental jurisdiction under 28 U.S.C. § 1387(a) for "all other claims that are so related to the claims in the original action [raising original federal jurisdiction] that they form part of the same case or controversy under Article III."  This of course refers to the question

---

[2] The City similarly ignored "original jurisdiction" under 28 U.S.C. § 1343(a)(1) and (4) for any "cause of action [to] recover for damages or injury [suffered from] a conspiracy" under 42 U.S.C.  § 1985 or to "secure equitable or other relief . . . for the protection of civil rights . . . ."  Clear Sky has identified precisely such a conspiracy and is seeking damages and equitable relief under the Uniform Act, as well as the 5th and 14th Amendments to bar more violations.

[3] This case does not involve a claim for relocation payments, for which an administrative appeal is possible, in part because the City barred Clear Sky from presenting such a claim.  Therefore, there is no issue of exhaustion in this case, as the cases discussing the APA and the right to an immediate appeal make clear.

[4] The City's cases, which generally ignore the APA, are all irrelevant because they were decided before the seminal Supreme Court decision on APA judicial review.  Darby v. Cisneros, 509 U.S. 137 (1993).  See Renfroe v. Housing Authority, 2004 WL 1630496 (E.D.La. 2004) at *1-2 (rejecting  as "not compelling" after Darby, the City's cases in National R.R. Passenger Corp. v. Faber Enters., 931 F.2d 438, 443 (7th Cir. 1991), Ackerly, 881 F.2d at 993 (only denying § 1983 claim not APA review), and Rhodes v. City of Chicago, 516 F.2d 1373, 1378 (7th Cir. 1975)).

whether the claims derive "from a common nucleus of operative facts" as posed by United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966).

The Breach of Contract cause of action arises from the City's promise to cooperate and provide information about its appraisal and valuation position in return for Clear Sky's forbearance, which the City's breached when the City failed to honor those commitments.  These are the same acts and omissions discussed above that also constitute violations of the Uniform Act.  Claim at ¶¶ 90, 95-99 (offer and acceptance); Claim at ¶¶ 62-87, 100-136, 172(a)-(z) (breach of duty); Claim at ¶¶ 88-89, 203 and Prayer for Relief (d) (damages).  As a result, supplemental jurisdiction exists for the Breach of Contract cause of action under 28 U.S.C. § 1387(a).

## II.    CLEAR SKY HAS PROPERLY ALLEGED UNIFORM ACT VIOLATIONS BY THE CITY THAT CANNOT BE DISMISSED

### A.    The City Has Committed More Than Two Dozen Uniform Act Violations

There should be little dispute that Clear Sky has properly alleged dozens of violations of the Uniform Act by the City individually and collectively with its agents and partners, including Greenhorne.  Nearly 20 pages of such them appear in the Complaint pleading, 26 key acts and omissions are listed at ¶ 190, and the claims are explained and summarized *supra*.  Just a few of the more egregious violations are:

- The City rigged an appraisal to undervalue Clear Sky by more than $6.5 million, due in part to a City command to use square footage and due to a ridiculous 43% depreciation based on IRS rules for *accelerating tax deductions*.[5]

- The City tried to defraud Clear Sky into accepting the illegal appraisal by falsely claiming it had been "independently" reviewed, even though the City paid its own agent to approve it, while also paying the same agent to negotiate the lowest payout.[6]

- The City refused responses to Clear Sky's 10 initial questions, after contractually

---

[5] Claim at ¶¶ 44-50, 80-94, 160-180; 42 U.S.C. §§ 4601, 4621(a)(b)(c), 4628, 4655; 49 CFR Parts 24.2(a)(2), 24.5, 24.102(c), (n)(1)-(3); 24.103(a)(2); 24.104.

[6] Claim at ¶¶ 44-50, 77-86, 160--180; 42 U.S.C. §§ 4601, 4621(a)(b)(c), 4628, 4655; 49 CFR Parts 24.2(a)(2), 24.5 24.102(c), (n)(1)-(3), 24.103(a)(2), 24.104.

promising to answer them and being required by the Uniform Act to do so.[7]

- The City refused to discuss a word of Clear Sky's 14-page appraisal analysis, or to update the appraisal and deposit as required after admitting major errors.[8]

- The City has so far refused to provide *any* relocation assistance, much less the required interview, economic analysis, and identification of relocation options.[9]

There can be no legitimate question that these egregious violations strike at the core of the Uniform Act, and that the same acts and omissions constitute Equal Protection, Due Process and 42 U.S.C. §§ 1983/1985/1988 violations.  The Motion to Dismiss should be rejected.

**B.      The City's Admits As It Must That It Violated The Uniform Act,
And Raises Three Erroneous Reasons It Should Be Excused**

The City never attempts to dispute a single one of these Uniform Act violations, because they are well documented to have taken place and must be treated as true for purposes of their Motion to Dismiss.  Instead, the City argues that it is exempt from the Uniform Act in the present case.  The City's claim of immunity obviously is wrong, as shown by the binding Fourth Circuit precedent already discussed *supra*.  Even more controlling Fourth Circuit precedent, and simple logic, refutes each of the City's arguments.

**1.      Uniform Act § 4602 Does Not Apply To Prevent Clear Sky's Claims**

The City's primary argument that it should be allowed to violate the Uniform Act with impunity is based on 42 U.S.C. §§ 4602 and 4651.  See Greenhorne Memo to Dismiss; City Memo to Dismiss.  Fourth Circuit authority on point already has specifically rejected this argument, and there are many different reasons discussed in a), b) and c) why the Fourth Circuit held correctly.

**a)      "Federal Agencies" Not States Are Governed By §§ 4602/4651,**

---

[7] Claim at ¶¶ 44-50, 88-125, 166-180; 42 U.S.C. §§ 4601, 4621(a)(b)(c), 4625, 4628, 4655; 49 CFR Parts 24.5, 24.102(c), (n)(3), (f)-(g), 24.103(a)(2), 24.106(j), (h).

[8] Claim at ¶¶ 44-50, 88-90, 114-133, 166-180; 42 U.S.C. §§ 4601, 4621(a)(b)(c), 4628, 4655; 49 CFR Parts 24.102(c), (n)(3), (f)-(g), 24.103(a)(2), 24.106(j), (h).

[9] Claim at ¶¶ 44-50, 136-154, 167-168; 42 U.S.C. §§ 4601, 4621(a)(b)(c), 4625, 4628, 4655; 49 CFR Parts, 24.5, 24.102(n)(1)-(3), 24.103(a)(2), 24.106(h); 24.205.

## While § 4655 Applies Nine Acquisition Requirements To States

The provisions of § 4651 require the "heads of Federal Agencies" to follow nine specific guidelines when acquiring property.  The City is not the head of any federal agency.  Therefore, the limitation that § 4602(a) places on the application of § 4651 to the "heads of Federal Agencies" has no relevance to the City as a matter of the most basic logic.

Instead § 4655, completely ignored by the City, is the provision that requires state entities "in acquiring real property [to] be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 4651 . . . and the provisions of section 4652 . . . ."  [Emphasis added].  In other words, the nine acquisition policies are copied and applied to the states by § 4655.

The Fourth Circuit analyzed § 4655 and reached the exact same conclusion, reversing a district court decision that erroneously had allowed a city to ignore the "federal real property acquisition procedures" under the Uniform Act based on § 4602 and § 4651.  The Fourth Circuit held it "unmistakable from the plain language of § 4655 that the states must comply with the land acquisition procedures specified in § 4651."  City of Columbia South Carolina v. Costle, 710 F.2d 1009, 1012 and n1 (4th Cir. 1983) (rejecting as irrelevant cases like the 7th Circuit decision cited by the City here, Rhodes, 516 F.2d at 1373-74 (7th Cir. 1975)).[10]

All 15 cases cited in Argument II.A. *supra*, including the Fourth Circuit rulings in M.M. Crockin and American Dry Cleaners, are in accord with Costle because they all agree that Uniform Act causes of action can be brought in federal court regardless of §§ 4602 and 4651.[11]

---

[10] To be fair to the City, an unpublished district court case also missed the controlling precedent, although the reason there was the "*pro se*" plaintiff obviously did not understand the statute or have the capability to research the relevant decisions.  Starr v. Shucet, 2005 WL 1657102 (W.D.Va. 2005), aff'd 2006 WL 207515 (4th Cir. 2006) (unpublished).

[11] Bethune v. United States Dept. of Housing and Urban Devt., 376 F.Supp. 1074 (W.D. Mo. 1972) also accords.  There, the local county enacted a "resolution" assuring that the "land acquisition and relocation policy provisions of Title 42 U.S.C.A. Section 4601 et seq. would be followed" just like the City "resolution" here to "satisfy" all "federal requirements."  Id. at 1078.  Although Bethune does not mention § 4655 specifically, it concludes that given the "contractual relations" between the federal and county agencies and "42. U.S.C.A. Section 4651" -- presumably as a result of § 4655 -- the state entity had to comply fully with the Uniform Act in dealings with the owner.  Id. at 1078.

Only three months ago, the Supreme Court of Appeals of West Virginia reviewed the same provisions and reached the same conclusion, relying on the language of § 4655 and the Fourth Circuit holding in Costle. "Plainly, then, unless there is some impediment to compliance under state law, the [state] is required [by § 4655(a)(1)] to fully comply with the [nine acquisition] provisions of 42 U.S.C. § 4651." State v. Reed, ___ S.E.2d __, 2012 WL 453616 at *6 (W.Va. February 10, 2012) ("The uniform relocation act further requires states seeking federal funds to comply with the provisions of the act") (citations omitted).

A few years earlier, the same high court specifically rejected the relevance of § 4602 and § 4651. Those provisions "by their terms apply to *federal agencies* in the acquisition of real property for federal projects." West Virginia Dept. of Transp. v. Mobile Homes Sales and Svcs., Inc., 624 S.E.2d 468, 472 (W.Va. 2005) (emphases added). Here, where a state is involved, "42 U.S.C. § 4655 makes the provisions of [§ 4651] obligatory on the states . . . . As a condition of receiving federal assistance for a project resulting in the acquisition of real property, a State agency must agree to comply with the terms of the Act. See 42 U.S.C. § 4655 . . . ." Id. (other citations omitted). "The import of these various statutory and regulatory provisions [under 42 U.S.C. § 4601 *et seq.* and 49 C.F.R. Part 24] is that they apply equally to state agencies carrying out responsibilities detailed in the federal [Uniform] law." Id. (citing 42 U.S.C. §§ 4651, 4655 and 49 C.F.R. 24.1 (1989)); accord Wil-Tex Plastics Mfg., v. Dept. of Housing and Urban Devt., 346 F.Supp. 654, 659 (E.D. Pa. 1972) ("Section 305 [§ 4655] makes the provisions of Section 302 [§ 4651] applicable to state agency acquisitions" after January 1971).

Therefore, § 4602 and § 4651 can do nothing to bar Clear Sky's claims.

### b) Clear Sky's Uniform Act Claims Do Not Turn On § 4651, and § 4602(b) Only Proves Clear Sky Has Enforceable Rights

In any event, Clear Sky's Uniform Act cause of action identifies dozens of Uniform Act violations by the City. Not a single one turns on any violation of § 4602 or § 4651, nor could they

given that those provisions only apply to "heads of Federal Agencies".  Instead, every claimed violation expressly arises under the language of *different* provisions of the Uniform Act governing *state* entities that were violated by the City.  See, *supra*, footnotes 4-8 (listing 20 violated provisions of the Uniform Act other than §§ 4602 and 4651).

Indeed, Congress specially delegated extensive regulatory authority under 42 U.S.C. § 4633 to "Lead Agency" USDOT to define the requirements of the law, even commanding that it "shall . . . develop, publish, and issue . . . such regulations as may be necessary to carry out" the *entire* Uniform Act.  Id.  Complying with this obligation, the USDOT's FHWA promulgated 42 C.F.R. Part 24 in 1989 and has regularly updated it through 2011.  Those FHWA regulations pursuant to § 4633 provide all the justification needed for Clear Sky's claims regardless of § 4651.  Not a single one of the City's arguments or cases addresses, much less rejects, application of a single one of these regulations -- perhaps because not one of the City's cases involves a taking after the FHWA's promulgation of those regulations in 1989.

The language of § 4602 and § 4651 only proves that Clear Sky's claims based on other Uniform Act provisions must be valid.  The § 4602(a) wording obviously does not preclude Clear Sky from having any "rights" *at all* under the Uniform Act, as the City claims.  If § 4602(a) barred all rights, then § 4602(b) limiting "elements" of claims regarding "value and damages" "in any condemnation proceeding" would be mere surplusage.  Logically, it would be unnecessary for the Congressional drafters to explain in § 4602(b) that the Uniform Act cannot be used as an element of value or damage in a condemnation proceeding if the law did not create any rights *at all* according to 4602(a).  Instead, § 4602(b) exists because the drafters knew from the start that the rest of the Uniform Act beyond § 4651 would create *many* rights and privileges, all of which would be fully enforceable – even "in" condemnation proceedings – except only to create new "elements of value or of damage" in suits of that specific nature.  Here, Clear Sky is asserting exactly those rights and

privileges that § 4602(b) anticipated would arise under the rest of the Uniform Act beyond § 4651.[12]

Accordingly, the Motion to Dismiss again fails for this additional reason.

### c)  Congressional Intent Only Shows The Drafters Expected Regulations And Claims Precisely Like Those Asserted Here

Courts need not and should not review legislative intent when a law and implementing regulations are unambiguous, like those here.  United States v. Harvey, 814 F.2d 905, 913 (4th Cir. 1987) ("Statutory construction properly beings with . . . the literal language of the statute . . . and it properly ends there unless the language is ambiguous") (Supreme Court citation omitted).  However, if this Court decides to consider such history, a proper review only confirms the propriety of cases allowing judicial review under the Uniform Act.

### 1)  First, The Senate Passed A Bill With Judicial Review

The distinguished Senator Edmund Muskie worked as lead sponsor for years to pass the Uniform Act.  He explained that the "landmark" law, "as high priority a measure as stands before the Senate", had "one basic purpose, and that is to make [people] 'economically whole' [because] when property is taken for a public purpose . . . the owner will receive [only incomplete] just compensation."  See Exhibit 2, 115 Cong. Record at 31533-34 (October 27, 1969).  "The uprooting of [a] business . . . is a very personal matter . . . [that we] cannot make . . . painless, but we can insure fair and evenhanded administration [so as not] to continue to exact a high price from people who are least able to absorb the burden of these Federal programs."  Id.  The requirements of the law are not "simple or easy [but they] are right and necessary."  Id. at 31535.

A Senate Committee report made clear the sense of the Senate that judicial review of Uniform Act violations would be available for "titles II and III", i.e., what is now known as § 4621 through § 4655.  Exhibit 3, Sen. Rep. No. 91-488, 1st Sess. at p.4 (October 21, 1969).

---

[12] Just as obviously, Clear Sky is not alleging any Uniform Act violation as an "element of value or damage" "in any condemnation proceeding" per § 4602(b).  Clear Sky demands that the City comply with the Uniform Act before the City can move forward with a condemnation action.  See Claim at ¶ 190 and Prayer for Relief.

### 2)  Second, The House Amended To Remove Judicial Review

The subsequent House floor debate shows that the Congress agreed with the intent of the new law to ensure that the "few should not be made to pay unfairly for the progress that will benefit the many."  Exhibit 4, 116 Cong. Record (December 7, 1970) at 40170.  House lead sponsor Representative Edmundson explained that "we have established in the law the principle that the Government can no longer come in and offer a price far below the [proper] appraisal [and this] will put to an end for all time to the practice some agencies have been unfortunately guilty or [sic] taking advantage of the  . . . landowner who is willing to cooperate with the Government and give them the property at the price that is first offered by the Government."  Id. at 40168.

However, instead of simply passing the original Senate language, the House passed an amended version to bar judicial review of relocation "payments" under sections II and III:

<em>Finality of Determinations</em>

*Section 102. [i.e., § 4602] (a) Any determination by the head of a Federal agency as to payments under sections II and III [i.e. § 4621 through § 4655] shall be final <u>and no provisions of such titles shall be constructed to give any person a cause of action in any court, nor may any violations . . . be raised as a defense in any action.</u>*

*(b) The provisions of section 301 [i.e. § 4651] . . . create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation.*

*(c) Nothing in this Act shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or of damage . . . ."*

<u>See</u> Exhibit 4 at 40164 (emphasis added).

### 3)  Third, The Senate Recognized What The House Had Done,
### So The Senate Amended Again To Restore Judicial Review

Had the Senate accepted this House language unaltered -- *it did not* -- the City might have an argument at least if this case involved cash "relocation" payments.  Indeed, Senate staff prepared a memo recognizing that the "judicial review feature included in the [original] Senate version was knocked out".  Exhibit 5, 116 Cong. Record (December 17, 1970) at 42138.  Senator Percy also

22

noted in his summary that the original Senate intent had been to "apply the administrative procedure

and judicial review provisions of the APA to all determinations under this bill" but proposed House

"section 102 . . . would preclude judicial review of *any* determinations . . . and raising any violation

of the proposed act as a defense in any court." Id. at 42139 (emphasis in original).

To prevent this result, Senator Muskie explained from the well of the Senate that he was

"offer[ing] an amendment that will leave the question of review *in* the existing law." Id. (emphasis

added).  The Senate amendment specifically struck House provision 102(a) block quoted above, and

even removed the explanatory title "Finality of Determinations" since it was no longer accurate.  Id.

at 42137.  Senator Muskie walked through this legislative history and intent for his colleagues as

they considered how to vote:  "The principal amendment has to do with the question of judicial

review.  The Senate bill, as enacted provided for judicial review.  The House struck out that

provision.  We are now offering an amendment that will leave the question of review in the existing

law." Id. at 42139.  The language of the House bill, as amended to restore judicial review, then

passed the Senate based on that representation to the assembled Senators.  Id. at 42140.

### 4)  Fourth, As Part Of Final Passage, The House Expressly Voted To *Accept* The Senate Amendment Restoring Judicial Review

The next day the House considered and expressly accepted that Senate amendment as part of

the final passage of the law that was then signed by the President and continues in effect to this day.

In fact, lead sponsor Representative Edmunson expressly warned his colleagues that voting to

accept the Senate amendment would mean capitulating on judicial review for the Uniform Act:

> *Mr. EDMONSON:  The substance of the amendments added to the House bill by the Senate can be stated in about 1 minute.  [The] Senate strikes out [the 102(a)] language which they thought operated to limit judicial review.  They make it quite clear as to any eminent domain or condemnation case that there would be full judicial review afforded.  I believe it is agreeable to both sides, insofar as the committee is concerned, to accept this amendment.*

Exhibit 6, 116 Cong. Record (December 18, 1970) at 42506.  Furthermore, one of his House

colleagues explained that as amended the final Uniform Act "takes the rights of the individuals who

are not 'willing sellers' into greater considerations and assures them of proper relocation <u>before</u> the right of eminent domain is enforced on them." <u>Id</u>. at 42507 (emphasis added). The House bill, as amended by the Senate, was then passed and sent to the President for his signature. <u>Id</u>.

### 5) The City Attempt To Avoid This Clear Legislative History<br>Based On A Missouri District Case From 1973 Must Fail

The City implores this Court to ignore this crystal clear history, along with the Fourth Circuit precedent that applies the law exactly as intended, based entirely one district court's flatly incorrect reading from 1973 that was adopted uncritically by several other courts. <u>Barnhart v. Brinegar</u>, 362 F.Supp. 464 (1973). Even setting aside the controlling Fourth Circuit precedent that precludes this result, for sake of argument, this Court should not follow the unpersuasive trail of crums left behind by <u>Barnhart</u> to its dead-end conclusion.

Incredibly, the <u>Barnhart</u> case looks at a selected portion of this legislative history and somehow declares that Senator Muskie entered a "compromise" with the House to *drop* judicial review completely. <u>Barnhart</u>, 464 F.Supp. at 471, 475 (nowhere identifying the provision protecting state agencies in the final law). Obviously, nothing could be further from the truth, as the only fair reading of the historical record above demonstrates.

In order to reach its preferred conclusion, <u>Barnhart</u> seems to decide that both Senator Muskie and Representative Edmundson effectively lied to their colleagues from the Senate and House floor: According to <u>Barnhart</u>, Senator Muskie was "misleading" when he told his colleagues without the proper "context" that the amendment "will leave the question of judicial review in the law" and Representative Edmondson did not "merit[] credit . . . for clarity and precision" when he advised his colleagues that "full judicial review" had been restored. <u>Barnhart</u>, 464 F.Supp. at 471-72 (failing to mention that the actual language of the law was read into the record, providing all the "context" possible). Based on those two less than persuasive declarations, <u>Barnhart</u> then finds that the final law somehow completely "preclude[s] judicial review" precisely as if House 102(a) had

not been stricken.  Id. at 472.  For good measure, though again without any support whatsoever, Barnhart extends that conclusion to "state agency actions under  . . . section 301 [§ 4651] of the Act" even though the word state appears nowhere in § 4651, nor the legislative history quoted in that case.  Id.

Therefore, Barnhart, and those cases that adopted it uncritically, can and should be rejected.[13]  In fact, the result is compelled by the mountain of the actual legislative history, the clear statements by Senator Muskie and Representative Edmundson, the plain language of the law, persuasive authority like Dodson and the two month old Reed case, and most importantly of all the controlling Fourth Circuit precedent in M.M. Crockin, American Dry Cleaners, and Costle.

### 2.   Virginia And Its Cities Have No "Waiver" From The Uniform Act

Given the irrelevance of § 4602 to this case, the City alternatively claims it obtained a waiver of all Uniform Act obligations through § 4604(a). However, the City completely misunderstands § 4604, which by its terms only has to do with transfer of federal agency obligations to the state, and has nothing to do with the state's own distinct obligations under other parts of the Uniform Act.  The City also misses the relevant provisions of the Uniform Act in 42 C.F.R. 24.601-02 that can provide a waiver for the state – or perhaps elected not to raise it since no such waiver exists or could be controlling given the limits on such waivers in 42 C.F.R. 24.7.

### a)   The City Cites The Wrong Waiver Provision For Federal Agencies, § 4604, And Does Not Provide Any Waiver Documentation

According to § 4604(a), the "head of a Federal agency may discharge his responsibilities under [the Uniform Act] by accepting a certification by a State agency that it will carry out such

---

[13] See Wil-Tex Plastics, 346 F.Supp. at 658 (E.D. Pa. 1972), (no judicial of federal agencies per Barnhart, but recognizing § 4655 would have applied to states had the taking happened after the 1971 effective date); Rhodes, 516 F.2d at 1377-78 (7th Cir. 1975) (relying on Barnhart in dicta); Paramount Farms v. Morton, 527 F.2d 1301, 1304 (7th Cir. 1975) (adopting Barnhart and Rhodes); Roth v. United States Dept. of Transp., 572 F.2d 183, 184 and n2 (8th Cir. 1978) (adopting Barnhart and other cases based on Barnhart); United States v. 249.12 Acres of Land, 414 F.Supp. 933, 934 (W.D. Okl. 1976) (adopting Barnhart); Consumers Power Co. v. Costle, 468 F.Supp. 375, 379 (E.D. Mich. 1979) (adopting Barnhart); Bunker Properties v. Kemp, 524 F.Supp 109 (D.Kansas 1981) (adopting Barnhart); National Railroad Passenger Corp., 931 F.2d at 433 (adopting Barnhart and refusing to follow Fourth Circuit in Costle).

responsibility, if the head of the lead agency determines that such responsibility will be carried out in accordance with State laws which will accomplish the purpose and effect of this" Uniform Act. [Emphasis added]. Here, no federal agency has delegated its responsibilities to the City or the state and there is no suggestion that state law would come anywhere close to having the same "effect"[14] as the far broader Uniform Act. If the City is in possession of an actual "certification" that says anything like the transfer contemplated by § 4604(a), the City has not bothered to provide a copy to this Court. No doubt, if such a "certification" suddenly appears, there will be many issues of fact requiring discovery as to its provenance, intent, and effect.

### b) A Limited Waiver For States Is Possible Under 49 C.F.R. 24.601, But The City Has Not Presented The Required Documentation

The Uniform Act has separate provisions that establish the City's obligations, and in certain circumstances *do* allow for a limited waiver of those responsibilities. However, once again, the City has made no attempt to show it obtained such a waiver, and the maximum allowed scope of a waiver could not reach Clear Sky's claims in any event.

According to 49 C.F.R. 24.4(a), "[b]efore a Federal Agency may approve any [funding] the State Agency must provide appropriate assurances that it will comply with the Uniform Act and this part." Thus, as a matter of law, the City has guaranteed full compliance with the Uniform Act. Indeed, the City made such a guarantee in the April 26, 2011 City Council resolution allowing "condemnations" to move forward conditioned on "satisfying all . . . federal requirements".

The Uniform Act explains that the City as "a State Agency [could have] fulfill[ed its] responsibilities under the Uniform act by certifying that it shall operate in accordance with State laws and regulations which shall accomplish the purpose and effect of the Uniform Act, in lieu of providing the assurances required by § 24.4 of this part." 49 C.F.R. 24.601. However, the state

---

[14] For example, VA Code § 25.1-415 only automatically updates state law for certain increases in monetary payments under the federal Uniform Act. State law does not purport to have the same "effect" as the federal law and thus is cited inappropriately by the City. State law cannot possibly matter because the *federal* Uniform Act expressly supersedes.

first would have had to "request an application for certification from the Lead Agency Director" which then "must be approved by the governor of the State [and] coordinated with the Federal funding Agency in accordance with application procedure." 49 C.F.R. 24.602. If such a waiver form was obtained, completed, executed, and accepted, the City has yet to provide the Court a copy. Should one be produced now, it would at most create an issue of fact as to its propriety. See 5A Fed. Proc. Forms § 13:149 (explaining this waiver process).[15]

The state actually confirmed that it is bound by the federal Uniform Act and obtained no such waiver when last updating its own "Transportation and Motor Vehicles Regulations" in 2005. See 24 Virginia Administrative Code (VAC) 30-41. The revised regulations explain that they were only "partially based [on the Uniform Act] which is implemented by 49 CFR Part 24", and the state took the position that its "regulatory action [to make the update was] exempt from the [Virginia] Administrative Process Act . . . which excludes regulations that are necessary to meet the requirements of federal law . . . 42 USC § 4601; 49 CRF Part 24". See Exhibit 7, Virginia Regulatory Town Hall, Form TH-09 (8/04) (February, 14, 2005) (emphasis added) at p.1; Exhibit 8, Virginia Register, Volume 21, Issue 13 p.1911 (March 7, 2005) (each regulation also cites relevant Uniform Act provisions).

Obviously, Virginia's statement that the Uniform Act controls the state would not have been truthful had the Uniform Act been waived as the City now claims. This all only proves that: The state has admitted it is governed by the Uniform Act; the state admits that its regulations *do not* fully implement the Uniform Act, and therefore; the Uniform Act regulations are fully enforceable.

### c) No Uniform Act Waiver Can Apply Here In Any Event

---

[15] The City seems to suggest in passing that it can somehow satisfy these detailed waiver requirements by pointing to passing *dicta* in a 1983 case that says Virginia once had a law, subsequently abrogated, that was "modeled on the Relocation Act" as it looked 6 years before passage of 42 C.F.R. Part 24 in 1989. Norfolk Redevelopment, 464 U.S. at 32 (holding only that Uniform Act does not apply, in part, to utilities). There was no documented waiver of the Uniform Act, much less to satisfy current requirements.

Regardless, other provisions of the Uniform Act preclude a waiver from being relevant here. "The Federal Agency funding the project may waive any requirements of this part not required by law" but *only* "if it determines that the waiver does not reduce any assistance or protection provided to an owner or displaced person under this part" and such a "request for a waiver shall be justified on a case-by-case basis." 49 C.F.R. 24.7. Therefore, even if the City could locate or manufacture an *ex post facto* waiver, it would be invalid *per se* to the extent it reduces the "protection" afforded Clear Sky by the Uniform Act. Such "protection" is the entire basis for Clear Sky's first cause of action, and provides support for all of the rest. Those protections *cannot* be waived under any circumstances according to the Uniform Act.

### 3. The Command To Follow The Uniform Act To The Extent "Practicable" Under State Laws Means To The Extent Not Barred, And Nothing In State Law Bars Compliance With The Uniform Act

Finally, the City admits that it decided not to fully comply with the Uniform Act, but argues that this is allowed because § 4651 [actually it is § 4655] only requires state compliance to extent "practicable under state law". The City claims it was not "practicable" to comply with the Uniform Act because one "section" of state law says that "section" of state law creates no rights of liabilities for state takings. City Reply Brief at 13-14 (citing Va. Code § 25.1-417(B)).

The Fourth Circuit previously rejected this *precise* argument in a case not cited by the City. "We conclude that by 'practicable' Congress intended to have the grant recipient comply with the § 4651 procedures to the fullest extent to which it is legally capable of complying under state law. . . . Section 4655 embodies an unambiguous indication that Congress, after weighing the various policy considerations, concluded that compliance with the § 4651 procedures should not be left to the grant recipient's own judgment as to its economic best interests." City of Columbia v. Costle, 710 F.2d at 1013 citing Beaird-Poulan, 497 F.2d at 58 (same); Whitman, 400 F.Supp. at 1066-68 (same); see also 5A Fed. Proc. Forms § 13:149 (explaining that state compliance guarantee under § 4655 "must

contain specific reference to any state law which the agency believes provides an exception).  The City points out not a single letter of state law, including VA Code 25.1-457, that *barred* it from complying with a single word of the Uniform Act.  There is no such state law.

Therefore, the City's "practicability" argument prevents none of Clear Sky's claims.  To the contrary, the City has only succeeded in making an admission against interest that it intentionally violated the Uniform Act.  Summary judgment motion practice should be swift.

### III.   UNIFORM ACT AND OTHER RIGHTS AT ISSUE HERE EXTEND TO INDIVIDUAL OWNERS, AND THEREFORE SAMUEL JACKNIN AND CHARLES EINSMANN ARE PROPER PARTIES TO THIS LITIGATION

Greenhorne alone, and not the City, also asks that this Court dismiss Plaintiffs Samuel Jacknin and Charles Einsmann for the additional reason that they are the owners of the LLCs at issue.  However, Greenhorne again misunderstands the Uniform Act and the interests at play.  The Uniform Act is specifically directed to protect the interest of individuals as well as the businesses they control. Mr. Jacknin and Mr. Einsmann are the ones who are entitled to and must consider the valuation of their property and work with City on relocation issues if they do not simply want to receive cash and close the business.  Mr. Jacknin and Mr. Einsmann have the interest and ability – that is being destroyed by the City – to open additional car was entities based on their experience with and good will from the underlying LLCs, an asset that is not owned by the entities themselves. For the same reason, the contractual agreement and underlying due process and equal protection rights arise for Mr. Jacknin and Mr. Einsmann as well as for the LLCs.

Indeed, for this reason, nearly every Uniform Act case cited by Clear Sky in this brief included not only the underlying business at issue but also listed the owners as natural persons as plaintiffs.  Accordingly, the Greenhorne request to dismiss Mr. Jacknin and Mr. Einsmann as individual plaintiffs should not be granted.

## CONCLUSION

WHEREFORE, Clear Sky requests that the Greenhorne Motion to Dismiss be denied.

Respectfully submitted,

/s/ _____

Edward J. Grass, Esq.
Virginia Bar: 48010
Attorney for Plaintiffs
9501 Burke Road #10784, Burke, VA 22015
Phone: 202-256-2471, Fax: 703-652-0799
Email: egrass@me.com
Dated: May 29, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of May 2012, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system to serve:

| | |
|---|---|
| Jessica Leigh James | T. Jeffrey Salb, Esq. |
| Counsel for Greenhorne & O'Mara, | Counsel for Defendant City of Chesapeake |
| Thomas Copeland, Evelyn Jones & Dan Jones | Breeden, Salb, Beasley & Duvall, |
| Franklin & Prokopik PC | PLC 555 E. Main Street, Suite 1210 |
| 2325 Dulles Corner Blvd Suite | Norfolk, VA 23510 |
| 1150 Herndon, VA 20171 | |

And I hereby certify that I will mail the document by U.S. Mail to the following non- filing

users and/or attorneys who have not yet entered an appearance:

| | |
|---|---|
| Christopher D. Eib | Kent P. Porter |
| Senior assistant Attorney General | Assistant United States Attorney |
| Office of the Attorney General | World Trade Center, Suite 8000 |
| 900 East Main Street, Richmond, VA 23219 | 101 West Main Street, Norfolk, VA 23510 |

Respectfully submitted,

/s/ _____

Edward J. Grass, Esq.
Virginia Bar: 48010
Attorney for Plaintiffs
9501 Burke Road #10784 Burke, VA 22015
Phone: 202-256-2471 Fax: 703-652-0799
Email: egrass@me.com
Dated: May 29, 2012

30